Chiharu G. Sekino (SBN 306589)
Casey T. Yamasaki (SBN 335445)
**MILLER SHAH LLP**
1230 Columbia Street, Ste. 1140
San Diego, CA 92101
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
cgsekino@millershah.com
ctyamasaki@millershah.com

Monique Olivier (SBN 190385)
Christian Schreiber (SBN 245597)
Cassidy A. Clark (SBN 335523)
**OLIVIER & SCHREIBER LLP**
475 14th Street, Ste. 250
Oakland, CA 94612
Telephone: (415) 484-0980
Facsimile: (415) 658-7758
monique@os-legal.com
christian@os-legal.com
cassidy@os-legal.com

*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tim Miller, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>Field Asset Services, Inc.; Field Asset Services, LLC; Xome Field Services LLC; Cyprexx Services, LLC; and DOES 1-10,<br><br>    Defendants. | CASE NO. _____<br><br>**COMPLAINT**<br><br>1. Failure to Pay Overtime<br>2. Failure to Reimburse Business Expenses<br>3. Waiting Time Penalties<br>4. Violation of the UCL<br><br>**DEMAND FOR JURY TRIAL** |

## NATURE OF CLAIM

1. Plaintiff, Tim Miller ("Plaintiff") brings this action against Defendants, Field Asset Services, Inc.; Field Asset Services, LLC; Xome Field Services LLC; Cyprexx Services, LLC; and DOES 1-10 (collectively, "FAS" or "Defendants"), for its unlawful employment scheme that denied Plaintiff wages and benefits to which he was lawfully entitled.

2. FAS evaded responsibility for paying Plaintiff's wages and employment benefits by purporting to hire him as a "vendor" and misclassifying him as an "independent contractor," while retaining significant control over the work that Plaintiff performed for FAS.

3. Accordingly, Plaintiff charges FAS with violations of provisions of the California Labor Code ("Labor Code"), the California Industrial Welfare Commission Wage Orders (hereinafter, "Wage Orders"), and the Unfair Competition Law, Business and Professions Code §§ 17200 *et seq*. ("UCL"). Plaintiff seeks declaratory and injunctive relief, restitution, compensatory damages, statutory damages, liquidated damages, statutory and civil penalties, attorneys' fees and costs, and pre- and post- judgment interest.

## PARTIES

4. Plaintiff is an individual resident of Paradise, California who has performed work for FAS at various properties in the Northern California Area.

5. Defendant Field Assets Services, Inc., was a Texas corporation, headquartered in Austin, Texas.

6. FAS has undergone a number of corporate changes in recent years.

7. Plaintiff alleges that Defendant Field Asset Services LLC was a successor in interest to Field Asset Services, Inc.

8. Thereafter, in or around August 2018, Field Asset Services LLC was acquired by Xome Holdings, LLC. In or around October 2018, Field Asset Services LLC changed its name to Xome Field Services LLC.

9. Defendant Xome Field Services LLC is a Delaware limited liability company, headquartered in Brandon, Florida.

10. In or around 2021, Plaintiff alleges that Xome Field Services LLC was acquired by and now operates as Cyprexx Services LLC.

11. Defendant Cyprexx Services LLC is a Delaware limited liability company, headquartered in Brandon, Florida.

12. Plaintiff sues fictitious defendants DOES 1-10 because their names and/or capacities and/or facts showing them to be liable are not known presently. On information and belief, Plaintiff alleges that their entities and/or capacities shall be ascertained through discovery. Plaintiff will seek leave to amend this complaint to show their true names and capacities when the same has been ascertained. On information and belief, Plaintiff alleges that each defendant designated herein as fictitious defendants were in some manner responsible for the occurrence and damages alleged herein.

13. FAS provides property preservation, maintenance, repair and rehabilitation, and remodeling services to various foreclosed properties throughout the United States, including California.

14. Plaintiff is informed and believes and thereon alleges that each of the defendants herein, including those fictitiously named, were at all times relevant to this action, the agent, employer, partner, supervisor, director, joint employer, managing agent, joint ventures, alter ego, or part of an integrated enterprise of the remaining defendants and each were acting within the course and scope of that relationship. Plaintiff sues Defendants on their own right and on the basis of respondeat superior.

15. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent to, ratified and authorized the actions alleged herein to each of the remaining defendants, including those fictitiously named defendants.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

17. This District is the proper venue for this action as a substantial part, if not all, of the events giving rise to this action have occurred in this District.

# FACTUAL ALLEGATIONS

**A. FAS'S BUSINESS MODEL MISCLASSIFIES ITS WORKERS AS INDEPENDENT CONTRACTORS RATHER THAN EMPLOYEES**

    **i. FAS Owns the Contracts With Its Clients and Then Uses Workers Like Plaintiff – Who Have No Say in Those Contracts – to Fulfill the Contract Terms**

18. FAS is a property preservation services company. FAS contracts with its clients – typically real-estate companies and banks that have foreclosed on homes – and then uses so-called "vendors," whom it classifies as independent contractors, to perform janitorial and maintenance work on those homes pursuant to those contracts until the properties are resold.

19. The property preservation industry experienced explosive growth and demand for workers in the wake of the 2008 housing crisis. Desperate for workers to maintain these foreclosed homes that were at risk of falling into disrepair or becoming havens for squatters and illegal activities such as drug and sex trafficking, FAS hired hundreds of workers like Plaintiff as "vendors" to perform the services required by FAS's contracts with its clients. The property preservation industry continues to thrive today, as there is always a need for real-estate and bank owned properties to be maintained for resale.

20. FAS's business model is straightforward. It alone negotiates the contracts with its clients. That is, FAS determines who becomes a client, what services will be provided to that client, and at what prices those services will be offered. The contracts include all essential terms of the work to be performed: the location, the scope of services, and the cost. FAS then uses its so-called "vendors" to perform the labor required by those contracts, assigning work to these individuals, directing them how to do the work, and telling them how much they will be paid for the work. The "vendors" not only have no involvement in the negotiation of the terms of the contracts, they are expressly forbidden from contacting FAS's clients directly.

21. Without "vendors" like Plaintiff, FAS could not and cannot offer its property preservation services. FAS has no employees other than its "vendors," including Plaintiff, who perform the property preservation services at its clients' properties.

22. FAS classifies its "vendors" as independent contractors, not employees. As a result, FAS has the following policies and practices. It does not require W-4 forms from its workers, and it does not treat its workers as W-2 employees. FAS does not pay any payroll or other taxes on behalf of its workers; instead, it generally pays workers, after it unilaterally determines whether the work has been done to its specifications, within 30 days of the worker documenting the work and requesting payment. FAS generally pays by the job, not the hour, no matter how many hours a job takes. FAS does not pay overtime or double time, even though it requires that jobs be completed within 72 hours and is aware that individuals are regularly working more than eight hours, and sometimes 12 hours, per day.

23. FAS does not reimburse workers for any reasonable business expenses that are necessary to perform the work, and which FAS is aware workers are incurring. FAS requires workers to procure and pay for general liability insurance, workers' compensation insurance, smart phones, computers, all tools and equipment necessary to complete the maintenance and repair work detailed on work orders, and all fees, such as business license fees and dump fees, that are required to perform the work. FAS also does not provide any transportation to or from the various worksites, which change on a regular basis, and does not reimburse for any mileage driven.

**ii.    FAS Requires Its Workers to Sign Non-Negotiable Employment Documents that Dictate the Job Terms and Pay Rates**

24. Prior to commencing work for FAS, FAS requires its "vendors" to review and complete FAS's Vendor Qualification Packet ("VQP"), which consists of several standardized, non-negotiable documents. The VQP is essentially an employment contract. Workers have performed work for FAS pursuant to the VQPs for years.

25. The VQP purports to "outline the terms and conditions of the relationship" between FAS and its "vendors." Workers have no meaningful opportunity to modify any of the terms of the VQP.

26. While the VQP states that the vendors are "independent contractors," it obligates them to perform work pursuant to detailed instructions and specifications included in the VQP (such as board ups, debris removal, and yard and maid services), in specific job orders, and in trainings and job memos regularly issued by FAS. Workers are required to acknowledge and accept these requirements and instructions by signing the VQP.

27. The VQP contains several non-negotiable provisions that described the work to be performed for FAS. For example, FAS retains the right to assign work outside of the parameters originally requested by vendors. FAS provides a standard price list that dictates how much FAS would pay workers for each property preservation task. FAS's workers did not have any meaningful ability to negotiate these prices.

28. FAS also requires workers to procure and pay for general liability, errors and omissions, and workers' compensation insurance coverage with set minimum coverage requirements and requires workers to list FAS as an additional insured on those policies. FAS also requires workers to have a business name and a business license.

29. FAS requires workers to document the work done in photographs taken before, during and after the work they perform. The VQP provides that workers will be subject to non-payment for a variety of deficiencies determined only by FAS including whether the work was done according to FAS's exacting specifications, whether the work was done according to deadlines FAS unilaterally set, and whether the work was documented according to FAS's rigorous photo documentation requirements (which include uploading photos within 24 hours of completing the work).

30. FAS also retains the right to assess "penalties" for what it unilaterally determines is noncompliance with certain work requirements, which further diminishes the amounts paid to workers. In sum, as provided in the VQP, FAS retains the right to enact and enforce requirements to ensure "all work [was] performed according to specifications and done in a timely, competent manner."

31. The VQP also forbids "vendors" from placing a lien on any property to be enforced in the event of non-payment for the work done on the property, even though liens are standard practice for legitimate contractors performing work on residential properties. *See* Cal. Civ. Code § 8416.

**iii.     FAS Assigns Work, Dictates How the Work Must Be Performed, and Dictates What Workers Will be Paid.**

32. FAS assigns property preservation work on a daily basis to its workers by sending them work orders through FAS's proprietary software. Workers are generally required to respond to the work orders within 24 hours, and to complete the work within three days.

33. FAS work orders list the amount FAS will pay for the work, the location of the work (the address of the property to service), and the FAS contacts for the property. FAS generally pays workers by the job, not by the hour.

34. The work orders contain a detailed list of tasks to complete and how to complete them. For example, for an initial clean of a property, a work order lists over fifty tasks and includes instructions such as: "Clean all mirrors, mirrored closet doors, and medicine cabinets with Windex (no streaks)" and "Hanging cardboard air fresheners are NOT acceptable!"

35. Workers are required to post a notice at the property stating that the property is being serviced by FAS.

36. FAS retains the right to reassign work at any time, even after a worker accepts the job.

37. If a worker declines a work order, FAS retains the right to penalize the worker for declining work by, among other things, providing less work in the future. In other words, when a worker is assigned a group of work orders, he is not allowed to "cherry pick" among the assigned work orders without fear of reprisal.

38. Moreover, a worker cannot set his own "cap" to limit or increase the amount of work orders he accepts. For example, FAS retains the right to unilaterally increase or decrease the amount of work it sent to workers based on its needs, or as a means of disciplining workers who FAS determines are not performing to its satisfaction.

39. Work orders contain a standard price that FAS pays for the job, but FAS retains the right to change or refuse altogether to pay. For example, work orders explicitly state that if work was "not completed in accordance with the instructions provided and conditions set forth in the work order, no fee will be paid[.]"

40. FAS requires its "vendors," including Plaintiff, to be the "eyes and the ears at a property," and to report any issues that are not contained in the work order. FAS requires Plaintiff and other "vendors" to identify any hazards and "bid" on repairing such hazards. Items requiring work via this "bid" process are also governed by a standard price list. All work, and the price that FAS pays for that work, is authorized exclusively by FAS. FAS retains all discretion as to the price it will pay and it rarely, if ever, deviates from the price list. Further, if a vendor fails to "bid" on work that needs to be

done to repair hazards identified on FAS's clients' properties, FAS requires the vendor to correct the issue at no cost to FAS. FAS repeatedly informs its workers that "all deviations from standard services" required a "bid" that "must be authorized directly through FAS."

41. In addition to the detailed requirements contained in the VQPs and the work orders, FAS requires its workers to attend various mandatory trainings which include instruction on how to perform janitorial and maintenance work. FAS tells workers that a failure to attend mandatory training may result in suspension or termination. FAS does not pay its workers for attending any trainings.

42. FAS also regularly directs its workers on how to do their jobs through training guides and detailed instructional memoranda. For example, FAS directs workers on the minutiae of janitorial work on its clients' properties: "When placing shrink wrap on the toilets, please poke two holes in the wrap to allow for ventilation;" "Please date and initial the zip tie with your company name and the person installing the tie using a permanent marker;" "The quality of work must improve & you all are the key to our success!!" "[Y]ou must provide action photos of removing the bleeder pin and after photos replacing a bleeder pin."

### iv. FAS Deploys Several Methods to Supervise Vendor Work and Ensure What it Deems Is Satisfactory Job Performance and Retains the Right to Discipline Workers for What FAS Deems Is Poor Performance.

43. FAS systematically supervises vendor work through several standardized methods.

44. Workers are required to submit updates via email throughout the day on the progress of an assigned work order. If FAS reached out to a worker for a status update, FAS expects the worker to respond within 24 hours. FAS retains the right to discipline workers who fail to respond in what FAS deems is a timely manner.

45. FAS monitors its workers through FAS's "Vendor Profile," which contains FAS's report of detailed instructions, "counseling," warnings, and discipline – including probation and suspension – given to workers. The Vendor Profiles are regularly and continuously updated by FAS.

46. FAS also requires its workers to take before, during, and after photos "from the same perspective, frame, and angle" of all work performed. Workers are required to upload these photos through the FAStrack Mobile, which uses GPS to report the time and location of each photo.

47. FAS requires "action" photos to confirm that workers are performing the work to FAS's specifications, including the use of specific tools or products such as air compressors, vacuums and air fresheners. As a result of these requirements, workers have to take and upload hundreds of photos for each job order.

48. FAS also has a Quality Control department, which monitors vendor work through inspection of the photographs, phone calls and emails, and on-site inspection of the properties.

49. FAS also monitors work performance by using scorecards, which score completion rate, amount of work declined, inspection results, proper photos taken and broker's signoff. If a scorecard rating is low, workers can suffer a reduction of future work assignments, be counseled, be suspended, or be terminated.

50. FAS's strict procedures and policies are designed to ensure "all work is performed according to specifications and done in a timely, competent manner." If a vendor's work does not meet FAS's approval, FAS reserves the right to invoke its disciplinary procedures and penalties. To that end, FAS has policies and procedures it has used to counsel and discipline workers, which include deductions to the worker's pay for work it deems inadequate, verbal and written reprimands, suspension, and termination of employment.

51. FAS requires workers to request pay through an onerous procedure that requires the uploading of hundreds if not thousands of before, during, and after photos of work performed at FAS's clients' properties in order to get paid. If workers do not adhere to FAS's stringent photo requirements or other details of the work order, FAS at its sole discretion retains the right to decline to pay for the work performed. Further, if FAS declines payment on a work order and later reverses the decline after a worker contests it, FAS automatically assesses a 10% penalty on the entire work order. That is, FAS penalizes workers for complaining that FAS was improperly withholding their pay.

52. FAS also regularly threatens to retaliate against its workers. FAS threatens workers that it will not pay for work performed in order to induce workers to perform according to FAS's wishes. For example, if FAS determines that a worker has been slow to respond or has failed to address an item on a work order, FAS instructs workers that it will "utilize the services of another vendor to remedy the problem at the expense of the original vendor."

B.   **FAS MISCLASSIFIED PLAINTIFF AS AN INDEPENDENT CONTRACTOR "VENDOR" AND DEPRIVED HIM OF HIS PAY AND BENEFITS**

53.   In 2009, Plaintiff signed a VQP with FAS. Plaintiff began working for FAS and continued to work for FAS until about 2012. As a "vendor" for FAS, Plaintiff was subjected to FAS's policies, procedures and conduct as described above.

54.   Prior to commencing work with FAS, FAS required Plaintiff to identify a business name and to obtain a business license. As a result, Plaintiff created a corporation and named his business as Curb Appeal Yard Care and Maintenance.

55.   Plaintiff's basic job duties for FAS included removing trash and debris from properties, winterization, minor repairs, board-ups, rekeys, yard maintenance, janitorial work, cash for keys, removing vehicles and appliances, and installation of smoke detectors and straps on water heaters.

56.   Plaintiff personally performed the work on a daily basis during his tenure at FAS. Plaintiff's daily schedule was as follows: Plaintiff typically started his day at 7 a.m. He reviewed the work order, went to the job location as directed by FAS and performed the job tasks as directed by FAS on the work order and according to the training and direction he received from FAS. He took before, during and after photographs of the work he completed. He typically arrived home between 6 and 10 p.m. Once home, he uploaded photographs and did paperwork necessary to document his work for FAS as well as prepare for the following day, which typically took him two to three hours. He typically worked seven days a week, for 10 to 14 hours a day. During the summer, Plaintiff worked approximately 14 hours a day.

57.   Plaintiff primarily performed work in the Butte, Yolo, Yuba, Colusa, Plumas, Sierra, Shasta, Tehama, and Glenn counties, but sometimes performed work for FAS outside of those counties as well when directed by FAS to do so.

58.   As directed by FAS, Plaintiff attended mandatory trainings. Plaintiff was never paid for those trainings.

59.   As directed by FAS, Plaintiff procured general liability and errors and omissions insurance and listed FAS as an additional insured.

60.   As directed by FAS, Plaintiff performed work according to the specifications in the work

1 orders and in the FAS trainings, requirements, memos and guidance.  Because FAS required work orders
2 to be completed within 72 hours, Plaintiff was required to regularly work over eight hours in a day
3 and/or forty hours in a workweek in order to meet FAS's deadlines.

4       61. As required by FAS, Plaintiff had to purchase all of the instruments of work in order to
5 perform work for FAS.  In particular, Plaintiff regularly incurred out-of-pocket expenses while
6 performing work for FAS including, but not limited to: fuel, insurance, supplies, office supplies, tools
7 and equipment, maintenance and repair of equipment and vehicles, storage fees, telephone and dump
8 fees.

9       62. On numerous occasions, FAS required Plaintiff to enter unsafe situations and Plaintiff
10 could not refuse those work orders without fear of reprisal.

11       63. In or around 2012, FAS terminated Plaintiff.

**C. FAS'S CONDUCT VIOLATES THE LABOR CODE AND THE WAGE ORDERS**

13       64. Plaintiff suffered violations of the Labor Code and Wage Orders arising from FAS's
14 conduct.

15       65. Wage Order 5-2001 applies to "all persons employed in the public housekeeping
16 industry."  Wage Order 5-2001, Cal. Code Regs. tit. 8, § 11050, ¶ 1 ("Wage Order 5").  "Public
17 housekeeping industry," is defined as, *inter alia,* "[e]stablishments contracting for development,
18 maintenance or cleaning of grounds; maintenance or cleaning of facilities and/or quarters of
19 commercial units and living units."  *See id.,* at ¶ 2.  Plaintiff was a person employed in the public
20 housekeeping industry and is thus entitled to the protections of Wage Order 5.

21       66. To the extent that Plaintiff is not covered by Wage Order 5, he is covered by Wage
22 Order 16-2001, Cal. Code Regs. tit. 8, § 11160 ("Wage Order 16"), which applies to On-Site
23 Occupations.  *Id.*, at ¶ 1.

24       67. To the extent that Plaintiff is not covered by Wage Order 5 or Wage Order 16, he is
25 covered by Wage Order 17-2001, Cal. Code Regs. tit. 8, § 11170 ("Wage Order 17"), which applies to
26 all employees not specifically covered in any other wage order.  *Id.*, at ¶ 1.

27       68. The term "employee" is defined in California Labor Code § 350 as a "person …
28 rendering actual service in any business for an employer."  The term "employee" is defined in Section 2

of the applicable Wage Orders as a person who is "engage[d], suffer[ed], or permit[ted] to work" by an employer. Plaintiff was an employee of FAS for which he performed services within these definitions.

69. Wage Orders 5 and 16 define "employer" as any person "who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." It further defines "employee" as "any person employed by an employer," and defines "employ" as to "engage, suffer, or permit to work." Wage Orders 5 and 16, ¶ 2. Under those definitions, Plaintiff was an employee who was employed by FAS.

70. Labor Code § 226.8 makes unlawful the willful misclassification of an individual as an independent contractor. That section also prohibits employers from charging an individual who has been willfully misclassified as an independent contractor a fee, or making any deductions from compensation, for any purpose, including for goods, materials, services, repairs, equipment maintenance, or fines arising from the individual's employment. *Id.*

71. Labor Code §§ 510, 1194 and 1198, and the applicable Wage Orders provide that employees must receive: (a) one and one-half (1 ½) times the regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and (b) double the regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek. Wage Orders, 5 and 16, ¶ 3; and Wage Order 17, ¶ 4. As a result of the policies and practices described herein, FAS failed to pay Plaintiff overtime pay as required by the Labor Code and the applicable Wage Orders.

72. California Labor Code § 2802 and the applicable Wage Orders provide that employers are responsible for the costs of all "necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer[.]" *See also* Wage Orders 5 and 16, ¶¶ 8-9. These provisions impose strict limitations on an employer's ability to offset the costs of business by imposing financial obligations on employees as a condition of discharging their duties. FAS violated these provisions by requiring Plaintiff to make purchases and incur work-related fees and expenses without reimbursement, and FAS was aware that Plaintiff had incurred such necessary expenses.

73. California Labor Code §§ 201-203 require an employer who discharges an employee to pay all compensation due and owing to that employee immediately upon discharge and that, if an employer willfully fails to pay such compensation promptly, the employer is liable for waiting time penalties in the form of continued compensation of up to thirty work days. FAS has willfully failed and refused to timely pay compensation and wages, including unpaid overtime pay to Plaintiff whose employment has terminated.

**D.   THE *BOWERMAN* CLASS ACTION**

74. On January 7, 2013, Fred and Julia Bowerman, on behalf of themselves and a proposed class of similarly situated individuals, filed a class action complaint against FAS asserting that FAS had violated provisions of the Labor Code and Wage Orders by misclassifying them as independent contractors (the "*Bowerman* Class Action Complaint"). *See Bowerman v. Field Asset Services, LLC et al.*, Case 3:13-cv-00057-WHO (N.D. Cal.).

75. The operative *Bowerman* Class and Representative Action included eight causes of actions, including the following four: (1) failure to pay overtime; (2) failure to reimburse business expenses; (3) waiting time penalties; and (4) violations of the Unfair Competition Law.

76. The district court thereafter certified a class ("Class Certification Order") defined as:

> All persons who at any time from January 7, 2009, and ending on December 20, 2016[1] (1) were designated by FAS as independent contractors; (2) personally performed property preservation work in California pursuant to FAS work orders; and (3) while working for FAS during the Class Period, did not work for any other entity more than 30 percent of the time. The class excludes persons who primarily performed rehabilitation or remodel work for FAS (the "*Bowerman* Class").

77. Plaintiff was a member of the *Bowerman* Class.

78. In March 2017, the district court granted partial summary judgment ("Summary Judgment Order") in favor of the *Bowerman* Class, finding that they had been misclassified as independent contractors and as a result, FAS was liable to them.

---

[1] The class period was initially "from January 7, 2009 up to and through the time of judgment," but the parties later agreed to fix the class period "from January 7, 2009 to December 20, 2016."

79. On July 5, 2022, the Ninth Circuit Court of Appeals ("Ninth Circuit") reversed the Class Certification Order and Summary Judgment Order.

80. On August 8, 2022, *Bowerman* filed a Petition for Rehearing or Rehearing En Banc and for Certification of Questions to the California Supreme Court with the Ninth Circuit ("Petition").

81. On February 14, 2023, the Ninth Circuit denied the Petition.

82. The formal mandate was issued by the Ninth Circuit on February 22, 2023, returning jurisdiction to the district court.

83. The applicable statute of limitations of Plaintiff's claims are tolled.

**FIRST CAUSE OF ACTION**
**Failure to Pay Overtime Wages**
**In Violation of California Labor Code §§ 510, 1194, 1198 and Wage Orders 5, 16 and/or 17**
**By Plaintiff Against All Defendants**

84. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

85. Defendants willfully misclassified Plaintiff as an independent contractor when he was an employee under California law. Plaintiff was as employee of FAS because Plaintiff was engaged, suffered, or permitted to work by FAS. Moreover, FAS directly or indirectly, or through an agent or any other person, employed or exercised control over the wages, hours, and/or working conditions of Plaintiff.

86. Labor Code §§ 510, 1194 and 1198, and the applicable Wage Orders provide that employees must receive: (a) one and one-half (1 ½) times the regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and (b) double the regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek. Wage Orders, 5 and 16, ¶ 3; Wage Order 17, ¶ 4.

87. Defendants had a policy and practice of classifying Plaintiff and others performing substantially the same work as Plaintiff as "vendor" independent contractors rather than W-2

employees. For most of the work Plaintiff performed, Defendants paid by the job, not the hour, no matter how many hours Plaintiff worked or the job took to complete.

88. Defendants had a policy and practice of requiring Plaintiff and others performing work as "vendors" to complete job assignments within 72 hours of the assignment. As a result, Plaintiff regularly worked over eight hours in a day and over forty hours in a week and, at times, worked over twelve hours in a day and/or in excess of eight hours on the seventh consecutive day of work in a workweek.

89. Defendants never paid Plaintiff overtime pay that he was owed under the Labor Code and applicable Wage Orders. Defendants knew or should have known that Plaintiff worked overtime hours.

90. As a result, FAS is liable to Plaintiff for unpaid overtime in amounts to be determined at trial, pursuant to California Labor Code Sections 510, 1194, and 1198, and Wage Orders 5, 16, and/or 17, plus interest, attorneys' fees and costs of suit, in amounts to be proven at trial.

**SECOND CAUSE OF ACTION**
**Failure to Indemnify Plaintiff for Expenses**
**in Violation of California Labor Code § 2802 and Wage Orders 5 and/or 16**
**By Plaintiff Against All Defendants**

91. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

92. California Labor Code § 2802 provides that:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful…. For purposes of this section, the term 'necessary expenditures or losses' shall include all reasonable costs, including, but not limited to, attorneys' fees incurred by the employee enforcing the rights granted by this section.

93. The rights provided in Labor Code § 2802 are not waivable. *See* Labor Code § 2804. Defendants illegally required that Plaintiff and other "vendors" waive their rights under § 2802 as a condition of work.

94. The applicable Wage Orders similarly require in pertinent part: "[n]o employer shall make any deduction from the wage," and "[w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer." *See* Wage Orders 5 and 16, ¶¶ 8-9. These provisions of the California Labor Code and applicable Wage Orders impose strict limitations on an employer's ability to offset the costs of business by imposing financial obligations on employees as a condition of discharging their duties.

95. FAS had a policy and practice of requiring Plaintiff and other "vendors" to pay for all business expenses necessary to do the work. FAS required Plaintiff to make purchases and incur work-related expenses without reimbursement, including but not limited to, cell phones, mileage, dump fees, insurance, and tools and equipment. FAS was aware that Plaintiff incurred such necessary business expenses.

96. Thus, Plaintiff is entitled to recover all actual and statutory damages and penalties applicable to these expenses, as well as reasonable costs of suit and attorneys' fees, in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**Waiting Time Penalties**
**In Violation of California Labor Code §§ 201, 202 & 203**
**By Plaintiff Against All Defendants**

97. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

98. Sections 201 and 202 of the California Labor Code require employers to promptly pay all wages owing to an employee at the conclusion of employment.

99. Plaintiff is no longer working for Defendants. Plaintiff was discharged, quit, or otherwise terminated from his employment with Defendants.

100. Defendants failed to pay all wages, including overtime pay, owed to Plaintiff at the conclusion of his employment, and their failure, as alleged above, was willful.

101. Plaintiff is therefore entitled to penalties against Defendants, in an amount to be determined at trial, pursuant to Labor Code Section 203, which provides that an employee's wages shall continue as a penalty until paid, for a period of up to thirty (30) days from the time they were due.

**FOURTH CAUSE OF ACTION**
**Violation of the Unfair Competition Law**
**In Violation of California Business and Professions Code §§ 17200, *et seq.***
**By Plaintiff Against All Defendants**

102. Plaintiff incorporates by reference as though fully set forth herein all preceding paragraphs of this Complaint.

103. The California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. ("UCL"), defines unfair competition to include any "unlawful," "unfair," or "fraudulent" business act or practice. Cal. Bus. & Prof. Code § 17200. A violation of California Business & Professions Code § 17200 *et seq*. may be predicated on the violation of any state or federal law.

104. California has an important public policy of protecting the welfare of employees, and thus provides for statutorily guaranteed wages for overtime, reimbursement of work-related expenses, and prompt payment of all wages owed to an employee at the conclusion of employment. *See* Cal. Lab. Code §§ 201-203, 226.8, 510, 1194, 1198, 2802, as well as Wage Orders 5, 16 and 17. To the extent that Defendants require Plaintiff to waive the benefits of said protections, Defendants violate the foregoing sections of the Labor Code, as well as Labor Code § 2804.

105. Defendants' misclassification of Plaintiff as an independent contractor, when he was truly an employee who performed the usual work of Defendants' business, is unlawful and unfair. Defendants' willful misclassification scheme, through which Plaintiff was denied overtime pay, reimbursement of work-related expenses, and prompt payment of all wages owed at the conclusion of the employment, has been, and continues to be, unfair, unlawful, and harmful to Plaintiff, the general public, and Defendants' law-abiding competitors.

106. Defendants' misclassification scheme allowed Defendants to strip Plaintiff of his fundamental employment rights as discussed above. Under their unlawful scheme, Defendants are further able to evade their other legal responsibilities as employers, and instead shift the burden of paying the costs of self-employment and unemployment taxes onto Plaintiff, as well as the costs of running Defendants' business.

107. Defendants' conduct as described above constitutes unlawful business practices for the reasons set forth below, without limitation:


      a. Defendants have violated various sections of the California Labor Code, including but not limited to Sections 201 and 202 (requiring payment of all wages due upon termination of employment); 226.8 (misclassification of employees); 510 and 1194 (requiring payment of premium pay for all overtime hours worked); and 2802, 2804 (requiring payment of reasonable and necessary business expenses); and

      b. Defendants have violated Wage Orders 5, 16 and/or 17;

108. Defendants' conduct as described above constitutes unfair business practices because FAS's conduct in denying lawfully earned wages outweighs any utility of such practices.

109. As a result of Defendants' unlawful and unfair conduct, Plaintiff suffered injury in fact and lost money and property, including, but not limited to loss of wages earned.

110. Pursuant to California Business and Professions Code § 17203, Plaintiff seeks declaratory and injunctive relief, restitution, disgorgement, and other appropriate equitable relief pursuant to Business and Professions Code § 17204.

111. Plaintiff seeks to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5. Pursuant to California Code of Civil Procedure § 1021.5, Plaintiff is entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

112. With their unlawful scheme, Defendants are able to unjustly keep and appropriate for themselves significant amounts of money that otherwise should have been paid to Plaintiff as wages.

113. Defendants also fail to reimburse Plaintiff for work-related expenses he incurred during the course of his employment in violation of Labor Code § 2802 and Wage Orders 5, 16 and/or 17.

114. Defendants' unfair business practices have reaped undue benefits and illegal profits, and unjustly enriched Defendants, at the expense of Plaintiff, other vendors, and the public.

115. Plaintiff has been personally injured by Defendants' unlawful business acts and practices, as alleged herein, including but not necessarily limited to the loss of money or property.

116. Pursuant to California Business & Professions Code §§ 17200 *et seq.*, Plaintiff is entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to commit their illegal acts, and for an accounting for and restitution of the monies unlawfully withheld and retained by Defendants.

117. Plaintiff is also entitled to disgorgement of illegally acquired profits by Defendants. Plaintiff is also entitled to an award of attorneys' fees and costs pursuant to the common fund doctrine, California Code of Civil Procedure § 1021.5 and other applicable laws.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for the following relief:

1. That FAS's conduct be declared unlawful;

2. That FAS be permanently enjoined from engaging in the unlawful acts and practices alleged herein;

3. That the Court award compensatory damages, liquidated damages and restitution in an amount according to proof to Plaintiff;

4. That the Court award statutory and civil penalties in an amount according to proof;

5. That Plaintiff be awarded pre-judgment and post-judgment interest on all sums collected;

6. That the Court grant costs of suit, including reasonable attorneys' fees, costs and expenses pursuant to applicable provisions of the Labor Code, the Civil Code and the Code of Civil Procedure; and

7. That the Court grant all such other relief as the Court deems just.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on all claims so triable.

Dated: March 22, 2023   **MILLER SHAH LLP**

*/s/ Chiharu G. Sekino*
Chiharu G. Sekino (SBN 306589)
Casey T. Yamasaki (SBN 335445)
1230 Columbia Street, Ste. 1140
San Diego, CA 92101
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: cgsekino@millershah.com
ctyamasaki@millershah.com

James E. Miller (SBN 262553)
**MILLER SHAH LLP**
65 Main Street
Chester, CT 06412-1311
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com

Monique Olivier (SBN 190385)
Christian Schreiber (SBN 245597)
Cassidy A. Clark (SBN 335523)
**OLIVIER & SCHREIBER LLP**
475 14th Street, Ste. 250
Oakland, CA 94612
Telephone: (415) 484-0980
Facsimile: (415) 658-7758
monique@os-legal.com
christian@os-legal.com
cassidy@os-legal.com

*Attorneys for Plaintiff*

COMPLAINT